IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| DOUGLAS L. WILSON, | ) | |
| | ) | Case No. 4:05CV3133 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| LIFE INSURANCE COMPANY | ) | |
| OF NORTH AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

This suit for disability benefits is brought under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001, et seq. Both parties have moved for summary judgment. I now resolve those motions with this opinion. The plaintiff wins, but the defendant may offset Social Security payments.

## I. PREFACE

Plaintiff Douglas L. Wilson ("Wilson") worked as a telephone cable repairer. Despite the fact that Wilson, a man in his fifties, suffered from very serious medical problems (including an acute heart attack requiring two stenting procedures, a stroke resulting from coronary artery disease causing loss of vision in the right side of each eye, poorly controlled diabetes, and peripheral vascular disease causing severe leg pain), and despite the fact that the Social Security Administration found him disabled and unable to perform either sedentary or light work, the defendant insurance company denied Wilson long-term disability benefits. While acknowledging Wilson's health problems and his inability to return to his former job, the defendant concluded that the plaintiff could work as a maintenance scheduler or a service dispatcher.

During the time the plaintiff and the defendant were fighting over whether the defendant was required to grant permanent long-term benefits, Wilson, who was

receiving temporary benefits under the policy, signed an agreement with the defendant regarding Social Security payments.  Following offset provisions of the insurance policy, the agreement obligated Wilson to reimburse the insurance company for any overpayment of benefits under the insurance policy that arose because Wilson also received Social Security benefits.  Although receiving Social Security benefits and, for a time, benefits under the insurance policy, Wilson refused to honor the agreement and reimburse the insurance company.

There are no material facts in dispute.  Reviewing the defendant's decision de novo (because the insurance policy did not confer discretion on the decision-maker), I decide that the plaintiff proved that he is entitled to long-term disability benefits.  I also decide that the plaintiff must honor the agreement he made with the defendant, and he must follow the insurance policy provisions regarding credits for Social Security payments.  My reasons for this decision are more fully set forth below.

## II.  BACKGROUND

The material facts are undisputed.  Those facts are set forth as follows:

### A.  The Plan

1.     At all times relevant to this lawsuit, defendant Life Insurance Company of North America ("LINA") issued a "Group Long Term Disability Income Policy" ("Policy") to Citizens Utilities ("Citizens"), Policy No. FLK-8137. (LINA 0422.[1])

---

[1]The facts are derived from the "Administrative Record" (Filing 18) and the plaintiff's evidentiary index (Filing 25).  The reference to "LINA" followed by a number refers to page numbers in the administrative record.  To some degree, the plaintiff's evidentiary index (Filing 25) duplicates the administrative record (Filing 18).  Plaintiff's Exhibit A to Filing 25 contains selected portions of the administrative record.  Plaintiff's Exhibit B to Filing 25 is the complaint.  Plaintiff's Exhibit C to

2.    The Policy states that:

COMMENCEMENT OF BENEFITS.

The Insurance Company will begin paying Monthly
Benefits in amounts determined from the Schedule when it
receives due proof[2] that:

(1)    the Employee became Disabled while insured for
this Long Term Disability Insurance; and

(2)    his Disability has continued for a period longer than
the Benefit Waiting Period shown in the Schedule.

DURATION OF BENEFITS.

The Insurance Company will stop paying Monthly Benefits
on the earlier of the following dates:

(1)    the date the Employee ceases to be Disabled;

(2)    the Employee's 65th birthday if he becomes
Disabled before his 60th birthday;

(3)    the end of 5 years from the date the Employee
becomes Disabled if he becomes disabled on or after
his 60th birthday.

(LINA 0453 (emphasis added).)  Another part of the policy defines when a person is
considered to be disabled.  According to the policy, "Disability" means different
things at different times, to wit:

───────────────────

Filing 25 is the answer and counterclaim.  There have been no objections to any of
these evidentiary submissions.

[2]As we shall see, this language is important, as it governs my standard of
review.

> An Employee will be considered Disabled if because of Injury or Sickness:  he is <u>unable to perform all the material duties of his regular occupation</u>; and after Monthly Benefits have been payable for 24 months, he is unable to perform all the material duties of <u>any occupation for which he is or may reasonably become qualified</u> based on his education, training or experience.

(LINA 0434 (emphasis added).)

### B.   *Wilson's Claim for Benefits*

3.   Wilson participated in the disability plan offered by his employer, Citizens.  (Ex. C, Answer to Complaint ¶¶ 5-6.)

4.   Wilson held the position of Communications Technician with Citizens.  (LINA 0001.)  Essentially, he worked as a telephone cable repairer and installer.  (LINA 0062.)  Wilson was born on August 1, 1951.  (LINA 0048.)

5.   At all times relevant to this lawsuit, Wilson was insured under the Policy.  (Ex. C, Answer to Complaint ¶ 6.)

6.   On or about October 9, 2001, while insured under the Policy, Wilson suffered a heart attack and after that he was diagnosed with a "[d]isabling right lower extremity claudication"[3] and a left/right femoral bypass operation was subsequently performed.  (LINA 0328 (history of heart attack and vascular problems); LINA 0329 (description of vascular surgery).)

---

[3]"Claudication" means "limping."     <u>Stedman's Medical Dictionary</u> 360 (27th ed. 2000).

7.     In the summer of 2002, Wilson suffered a stroke.  (LINA 0113 ("Master Sheet" for "Diagnoses," entry dated July 18, 2002, from Nebraska Heart Institute).)

8.     On or about June 24, 2002, Wilson was seen by Dr. Linda Blakely of the Kearney Eye Institute.  Dr. Blakely diagnosed Wilson with a right "homonymous hemianopsia"[4] and stated that:

> [Wilson] has no vision from midline and anywhere to the right side of that.  This is a significant disability that impairs even activities of daily living.

(LINA 0109.)

9.     Through a letter dated July 5, 2002, Wilson was informed that his application submitted to LINA for long-term disability ("LTD") benefits had been received.  (LINA 0388.)

### C.     Wilson's Initial Approval of Long-Term Disability Benefits

10.     Through a letter dated August 27, 2002, Wilson was first advised that his claim for benefits had been approved by LINA.  (LINA 0351.)

11.     On or about August 27, 2002, LINA documented its justification for its initial allowance of Wilson's LTD benefits by stating the following:

> All indications are that this employee is covered, but under class 10.   Agreed that approval of LTD at this time is

---

[4]A "homonymous hemianopsia" is "blindness in the corresponding (right or left) field of vision of each eye."  Stedman's Medical Dictionary 798 (27th ed. 2000).

> warranted . . . .  The claimant has a significant loss of his
> visual field that puts him at risk when working around
> electrical lines.

(LINA 0517.)

13.    Through another letter dated October 23, 2002, LINA again
informed Wilson that his claim for benefits had been approved.  (LINA 0336-0337.)

13.    In the above-mentioned October 23, 2002, letter from LINA to
Wilson, LINA stated the following:

> To qualify for Benefits under your LTD contract, during
> the first 18 months, you must be unable to perform, due to
> Injury or Illness, all the material duties of your regular
> occupation.  Thereafter, you must be unable to perform all
> the material duties of any occupation for which you may
> reasonably become qualified based on your education,
> training, or experience.  We will be requesting periodic
> updates on the status of your condition and we reserve the
> right to have you examined by a physician of our choice.

(LINA 0337.)

14.    On or about March 26, 2003, the Social Security Administration
disapproved Wilson's claim for Social Security Disability Benefits.  (LINA 0295.)

15.    On or about April 25, 2003, LINA informed Wilson that it was
investigating Wilson's claim for LTD benefits to determine if Wilson was eligible for
continuing benefits.  (LINA 0300.)

16.    On or about May 9, 2003, LINA documented an investigation interview with Wilson.  In the document, LINA reported that Wilson had stated that his heart doctor, Dr. Netz, had found:

> the lack of pulse in the leg and referred [Wilson] to [Dr.] Steffens for a femoral artery bypass with gortex, leg hurts worse now than before, burns all night long, keeps CX awake –eye sight has not changed and will not change, has blind spot in lower right quadrant of both eyes, has to hold written material close to eyes, still is able to drive but has this blind spot.

(LINA 0531.)

17.    On or about May 27, 2003, at the request of LINA, Dr. Diana Lind prepared an "Attending Physician's Statement of Disability" which diagnosed Wilson with "[r]ight homonymous hemianopsia  368.48."  (LINA 0207.)  Dr. Lind explained Wilson's disability with the following remarks:

> P[atien]t's restriction comes from loss of [right] half of vision. He cannot see any objects in the right unless he turns his head, at which time still his side vision is limited.

(LINA 0208.)

### D.    LINA's Decision to Deny Wilson Benefits

18.    In an internal document created on or about October 7, 2003, LINA explained its decision to deny the continuance of Wilson's LTD benefits. (LINA 0538.)  While the document is difficult to decipher because of its use of abbreviations and contorted syntax, there are several references to lack of information. For example, "none of the treating physicians assessed [Wilson's] physical capabilities or gave work restrictions or limitations[,]" "[n]o physician completed a

PA [physical assessment][,]" and "[o]nly Vascular surgeon Steffens noted not able to work on 4/11/03 . . . ."  (Id.)    The document also noted that Dr. Rodgers "refers assessment to Disability doctor to assesses if [Wilson] can work."  (Id.)

19.    In a letter to Wilson dated October 27, 2003, and despite the lack of information described in the October 7, 2003, internal notation described in the preceding paragraph, LINA concluded that a "Communication Consultant" or a "Dispatcher, Motor Vehicle" were the titles of occupations that Wilson was or would reasonably become qualified to perform based on Wilson's education, training, or experience.  (LINA 0186.)

20.    In a medical report prepared by the Kearney Clinic, P.C., on or about November 12, 2003, it was reported that Wilson had lost vision in his right eye. The report stated that:  "It sure looks like to me like he can't do any sort of work that will involve fine visual work.  He cannot do telephone climbing.  He could not do heavy lifting."  (LINA 0118.)

21.    On or about November 23, 2003, Dr. B. D. Rodgers prepared a physical abilities assessment requested by LINA (hereinafter referred to as "the Rodgers Report").  (LINA 0131.)

22.    The Rodgers Report gave the following assessment of physical abilities:

> Assessment of physical abilities: Sitting – 2.5 to 5 hours. Standing –  30 minutes to 1 hour.  Walking –  infrequently, 30 minutes to 1 hour at a time.  Climbing –  put [sic] rarely. Balancing –  rarely.  Kneeling –  never.  Crawling –  never. Crouching –  never.   Stooping –  rarely.   Hearing – continuously.   Reaching  over  head  _____  below waist 2-4 hours per day.  Seeing – the patient has chronic visual defect.  See notation at the end of page.  Smelling

and tasting – continuously.  Exposure to extremes of heat and cold – 1-2 hours at a time.  Exposure to odors, fume and particles – 1-2 hours at a time.   Ability to work extended hours – never.  Use of lower extremities – never or rarely, less than 30 minutes to 1 hour at a time. Exposure to vibration – 2-5 hours per day.  Exposure to wet and humid conditions – ½ to 1 hour daily.  Can work around  machinery  probably  2-5  hours  a  day.   Fine manipulation with left to right hands – constant, simple grasp right and left hands normal.  Firm grasp no more than 1-2 hours per day.

(LINA 0131.)

23.    The Rodgers Report under physical work level stated the following: "Lift, carry, push and pull, sedentary-see below." (Id.)

24.    Despite the above assessment of physical abilities, the Rodgers Report gave the following contradictory limitations:

Under additional comments.  Basically, this 52 year old male has been left with the following disability regardless of all the checks and marks that have been done on the prior page.  He has a chronic visual field cut, which would affect his ability to work on a daily basis, no matter what type of work he was in and I would give you the name of Dr. Jan Weber to give you a distinct idea of how much this would affect him.

Second, he relates to me at his last visit chronic continuous, ongoing leg pain where he can only stand for 30 minutes to an hour a day at a time without feeling like he has to sit down.  He becomes weak and tired and has inability to use his feet and walk and get around.  This again, I believe relates to his peripheral atherosclerotic vascular disease, obesity,  deconditioning,  and  probably  peripheral

-9-

neuropathy related to his diabetes mellitus, Type 2.  <u>I strongly recommend that that patient have a disability rating exam</u> done by a Nebraska Physician before giving him a full disability for these symptoms.  I have tried to delineate work that he could do but in general, your company would have to decide if he would be permanently disabled, related mostly to his problems with his leg and visual field defect.

(<u>Id.</u> (emphasis added).)

### E.    *LINA's Decision to Reopen Wilson's File*

25.    On or about January 9, 2004, LINA reopened Wilson's file and recognized the following:

Claim was denied not TD AO, but no TSA was done prior to the denial as none of his doctors would give limitations and restrictions.  Per note in Unilynx it appears they discussed file with VRC but file not documented with any specific occupations he would be able to perform.  After the denial they sent him a letter telling him what occupations they identified that he should be able to perform.  I do not actually see an appeal, but we got information from his doctor that gives limitations that should allow him to perform sed work.  TSA was done and occupations were identified.  They stopped benefits prior to the AO date.  Benefits should continue to that date.  I discussed this with SAS and we both agree this should go back to the team for further handling.  They have not paid the 24 months for HO and AO is not until 4/8/04.  The denied claim 6 months prior to AO date and did not pay up to the AO date.  Even though his doctor now gives limitations that should allow him to work at sed level, he still says that he is unable to work due to his vision problem.  Believe they should

investigate further prior to the AO date.  Gary reviewed and
he agrees.

(LINA 0544.)

26.    On or about March 18, 2004, LINA concluded that Wilson no
longer was disabled under LINA's definition of disability.  (LINA 0554.)  This
decision  referred to a one-page "Transferable Skills Analysis" (TSA) conducted at
the request of LINA.  (LINA 0554 referring to LINA 0183.)  The TSA was prepared
by Marion Reznik, a rehabilitation specialist, on December 12, 2003.  (LINA 0183.)
The TSA was based on review of documents that were only cryptically described.
The only document clearly described was the report of Dr. Rogers dated November
23, 2003.  (Id.)  In the labor market of Kearney, Nebraska, Ms. Reznik concluded that
Wilson could perform the work of a maintenance scheduler and service dispatcher.
(Id.)  Ms. Reznik's explanation is cursory:

> Diagnosis/L&R's:  Diabetes, Diabetic  Neuropathy,
> Homonyous Hemianospia, Right; Mr. Wilson is able to
> function at a "Sedentary" level of work for an 8hr/day.
> Fine manipulation and simple grasping are on a continuous
> basis.  Sitting and reaching overhead, at desk level, and
> below waist are on a frequent basis.  Standing, walking, and
> firm grasping are on an occasional basis.  Climbing,
> balancing, and stooping are "rarely."  He is unable to kneel,
> crawl, crouch, and stoop.  He has a chronic visual field cut.
>
> . . . .
>
> Summary: A Transferable Skills Analysis was completed
> using the above noted information.  Suitable positions were
> identified that meet Mr. Wilson's skills, education, work
> history, and wage replacement requirements.

(Id.)

27.     On or about March 22, 2004, LINA notified Wilson that his claim for benefits would be terminated effective April 9, 2004.  (LINA 0134-0136.)

28.     On or about March 31, 2004, Wilson requested a review of LINA's denial of his benefits.  (LINA 0127.)

### F.     *Wilson's Appeal of his Denial of Benefits*

29.     On or about June 8, 2004, Wilson appealed his denial of LTD benefits.  (LINA 0099.)

30.     One of the documents provided by Wilson in support of his appeal of his denial of LTD benefits was a six-page Vocational Evaluation (VE) dated May 28, 2004, from a vocational expert, Al Marchisio.  (LINA 0100 to LINA 0105.)  Not only did Marchisio evaluate relevant medical records, he also interviewed Wilson on two occasions.  (LINA 0101-02.)

31.     The VE recognized that Wilson's "alertness due to sleep deprivation [caused by leg pain] has to be considered in terms of being able to stay focused, concentrate and pay attention to detail."  (LINA 0104.)

32.     The VE relied upon Dr. Steffen as stating the following: "It sure looks to me like he can't do any sort of work that will involve fine visual work."  (LINA 0104.)

33.     The VE also cited a report by Dr. Janky which stated the following: "Mr. Wilson's visual condition will most likely not improve in the near future because of permanent damage.  This limits his ability to do things that require good vision and also anything that requires good side vision because of the loss of the right-side of his vision in both eyes."  (Id.)

34.    The VE also cited an evaluation performed by Dr. Burkman, a neurologist, which stated that "perhaps Mr. Wilson could perform light duty and in a non-dangerous situation."  However, Dr. Burkman qualified this by stating: "The more complicating factor in this gentleman's history in terms of work, however, would be how this chronic sleep deficit [due to the vascular problems in his legs] would impact on his ability to learn and even perform light duty adequately and over the long term.  He does state some memory loss and this may also be primarily stroke effects and/or chronic sleep deficit effects."  (LINA 0102.)

35.    The VE also cited a neurological evaluation by Dr. Weber and described that evaluation in the following way:  "1.  peripheral polyneuropathy of the mixed type (part demyelinating and part axonal) moderate in grade, particularly affecting sensory [a]xons and compatible with diabetes; 2.  and superimposed on this, there has been mild past injury to the axons of the obturator nerves bilaterally.  Dr. Weber also comments that the right homonymous hemianop[sia] could have been caused by [Wilson's] cerebral stroke."  (Id.)

36.    The VE cited an office note from Dr. Netz which stated the following:

> He had a prior anterior MI complicated by sudden cardiac death.  The diagnosis includes diabetes, history of peripheral vascular disease and diabetic neuropathy.

(LINA 0101.)

37.    The VE also cited a report of Dr. Blakely which "describes the impairment to the right eye, i.e. visual loss, which includes no vision from mid-line to anywhere on the right side of mid-line.  In Dr. Blakely's opinion this is a significant disability that impairs even activities of daily living."  (Id.)

-13-

38.     The VE cited a hearing evaluation completed by Dr. Connely on March 20, 2003, which revealed a "profound bilateral high frequency sensorineural hearing loss, right and left respectively."  (Id.)

39.     The VE provided the following summary:

> In my opinion, Doug Wilson cannot use his transferable skills to perform other occupations in either the light or sedentary classifications due to the deficit identified in this report.  The jobs nominated in exhibit 6f, i.e. information clerk requires frequent near vision, board attendant occasional near acuity, cafeteria attendant, occasional near acuity.  However, the physical demands of all three jobs are light and based upon Dr. Rogers' restrictions of 11/23/03 these jobs would be precluded due to exertional level.
>
> If credence is given to Mr. Wilson and the attending and consulting physicians, then consideration[] should be given to Medical/Vocational rule 201.14, i.e. Mr. Wilson is a high school graduate and his skills cannot be used in skilled or semi-skilled occupations.

(LINA 0105 (emphasis added).)

40.     Wilson also provided LINA with a June 5, 2004, letter from Dr. Burkman.  Burkman was a Fellow of the American Academy of Physical Medicine and Rehabilitation and a Fellow of the American Academy of Disability Evaluating Physicians.   Dr. Burkman reported the following:

> It should be of note that in terms of his total current disabilities and what would be expected in the future, his diabetic peripheral neuropathy in the lower extremities over time will get worse causing further weakness and sensory loss, especially in the distal portion of both legs.  This is going to have effects potentially upon his work ability such

that he may lose the ability to feel joint position sense with his foot against the ground.  We would normally teach people to compensate for this by using their vision in order to see their position of the foot and the ground, however, as noted in my clinic evaluation, this gentleman has a right homonymous hemianopsia, i.e., right visual field cut from his stroke and the diabetes as you know is going to affect almost everyone's eye.  Even though it is beyond my expertise to know exactly what jobs he may be qualified for (as a vocational rehabilitation consultant would be the best one to determine this), <u>I do feel that his combination of impairments would make any work situation extremely difficulty</u> [sic] and in some cases dangerous, i.e. he should not be allowed to get up on ladders or to walk on unprotected heights.

(LINA 0106 (emphasis added).)

41.    On or about June 28, 2004, LINA affirmed the previous denial of Wilson's claim for LTD benefits.  (LINA 0084-0087.)

### G.    The Social Security Decision Granting Wilson Disability Benefits

42.    On July 14, 2004, the Social Security Administration ("SSA") issued a fully favorable decision in favor of Wilson finding that Wilson was entitled to disability insurance benefits.  (LINA 0062-0063 & LINA 0048-0049.)

43.    The July 14, 2004, SSA Decision found that:

The medical evidence establishes that the claimant has the following "severe" impairments: status post myocardial infa[r]ction treated by stenting times two and with coronary artery disease, diabetes mellitus, poorly controlled; peripheral vascular disease and claudication, treated by femoral bypass; low back pain; status post CVA with loss

of right visual field; fatigue; hypertension; belated hearing loss; and bilateral carpal tunnel syndrome.

(LINA 0048.)

44.    The July 14, 2004, SSA Decision also found that:

The claimant has the residual functional capacity to perform less than sedentary level work.  He cannot sustained prolonged sitting, standing, or walking and needs frequent changes of position.  In an 8-hour day he can sit between 2.5 and 5 hours, stand up to 1 hour and walk infrequently up to 1 hour at a[] time.  He is precluded fr[o]m kneeling, crawling, and crouching and can occasionally climb, stoop, and balance.  Because of permanent loss of the right-sided vision in both eyes, he cannot perform fine detailed work nor can he do any job that requires good stereoscopic vision.  Because of his pain, he cannot maintain adequate concentration, persistence or pace.  He must avoid exposure to dangerous machinery, unprotected heights, and cold temperatures.  This finding is supported by the medical record and particularly by the results of a vocational evaluation in May 2004 (Ex. 16E).

(LINA 0049.)

45.    The July 14, 2004, SSA Determination also found that Wilson's residual functional capacity for the full range of sedentary work was impacted by his age.  (LINA 0049.)

46.    The July 14, 2004, SSA Decision states the following: "Considering the claimant's additional limitations, he cannot make an adjustment to any work that exists in significant numbers in the national economy; a finding of

disabled is therefore reached within the framework of medical-vocational rule 201.14 and Social Security Ruling 96-9p." (LINA 0049.)

47.     On July 19, 2004, Wilson through his counsel provided LINA with a copy of the July 14, 2004, SSA Decision finding that Wilson was unable to perform any work in the national economy.  (LINA 0064.)

### H.  The Complaint and Counterclaim

48.     On May 31, 2005, Wilson filed a Verified Complaint against LINA seeking damages arising under ERISA, 29 U.S.C. § 1132(a)(1)(B).  (Ex. B, Plaintiff's Amended Complaint.)

49.     LINA answered, denying that it owed benefits and asserting a counterclaim. (Ex. C, Defendant's Answer & Counterclaim.)   In the counterclaim, LINA asserted that Wilson owed it money because Wilson had received social security benefits that exceeded the amount LINA owed Wilson and, under the terms of the policy, those Social Security payments were to be offset against benefits owed Wilson.

### I.  Wilson's Obligation for Social Security Benefits and LINA's Payments

50.     The Plan provided that if Wilson was entitled to Social Security benefits, those benefits were to be credited against any benefits that LINA owed Wilson.  (LINA 0451.)  The policy specifically authorized LINA to deduct overpaid amounts from future payments or seek a lump-sum repayment of the overpaid amount. (Id.)

51.     So that he might continue to receive benefits from LINA without reduction while he also sought Social Security benefits from the government, and on

August 16, 2002, Wilson signed a reimbursement agreement. (LINA 0362.)   As
pertinent here, Wilson agreed and stated that:

> I have filed a claim for benefit under Group Short Term
> Disability (STD) and/or Long Term Disability (LTD). I
> understand that under the terms of the STD/LTD policy
> Benefits may be reduced by any amounts that I or my
> dependents, if applicable, receive or are assumed to receive
> including, but not limited to:
>
> . . . .
>
> •       Social Security disability or retirement benefits;
> . . . .
>
> I also understand the Insurance Company has the right to
> immediately reduce benefits by an amount it estimates will
> be received, but by signing this agreement and complying
> with its terms the Insurance Company will not reduce my
> benefits.
> . . . .
>
> If I later receive Other Benefits for myself or my
> dependents, if applicable, I agree to reimburse the full
> amount of any overpayment within 30 days after receiving
> the award.  In addition, I understand that the Insurance
> Company, at its option, will retain any future benefits
> payable, including Minimum Monthly Benefits, and use it
> to reduce the overpayment not refunded within 30 days.
> The Insurance Company reserves the right to obtain a lump
> payment to recover an overpayment even if future benefits
> are being withheld.

(Id.)

52.     Before it ultimately denied benefits, LINA paid Wilson $38,637
for 24 months of disability because Wilson could not perform his prior work with

-18-

Citizens.  (LINA 0336-0345.)  LINA asserts, and the plaintiff does not deny, that Wilson has not paid to LINA, and LINA has not received or set off, any Social Security benefits that Wilson received.  (<u>Compare</u> Filing 23, at 6 & 8 (Br. Supp. Def.'s Mot. Summ. J.) <u>with</u> Filing 26, at 3 (Br. Opp'n Def.'s Mot. Summ. J.).)

## III.  ANALYSIS

I first review Wilson's claim for benefits against LINA.  I then examine LINA's counterclaim regarding an offset for Social Security payments.  I decide that both claims have merit.

### A.  Wilson Gave LINA "Due Proof" That He Was Unable to Work at Any Job

Initially, I discuss what standard of review applies.  After that, I examine the merits of Wilson's claim.

### 1.  Standard of Review

The first issue I must resolve relates to the standard of review.   United States Circuit Judge William J. Riley, sitting as a district judge, has interpreted the provisions of a LINA policy containing identical "due proof" language.  He decided that the de novo standard of review must be applied because that language conferred no discretion upon LINA.  Judge Riley wrote:

> This court reviews LINA's denial of benefits "under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 115 (1989).  The LINA Policy states LINA "will begin paying Monthly Benefits . . . when *it receives due proof*" the claimant meets the eligibility criteria for disability benefits.  (Filing 30, Ex. 9, LINA 132)

(emphasis added).  The Eighth Circuit has concluded similar language does not confer discretion upon the administrator.  Reasoning "the deferential standard under <u>Bruch</u> is not triggered by an insurance policy's proof-of-loss provision unless it expresses an intent to confer discretion," the Eighth Circuit in <u>Bounds v. Bell Atlantic Enterprises Flexible Long-Term Disability Plan</u>, 32 F.3d 337, 339 (8th Cir. 1994), determined language in a plan stating benefits would be paid "after [the administrator] receives adequate proof of loss" did not confer discretion upon the administrator.

The LINA Policy provision regarding the payment of benefits does not express an intent to confer discretion.  The language "when it receives due proof" does not explicitly identify LINA as the entity to determine whether the proof is due.  The clause simply provides LINA must receive "due proof."  In the absence of language indicating LINA is the entity to determine if the proof is due or adequate, this court interprets the provision to allow payment of benefits when a reasonable objective person believes he or she received due proof, subjecting LINA's eligibility determination to de novo review.

<u>Kramer v. Life Ins. Co. of North America</u>, 8:03CV152, slip op. at  4 (D. Neb., July 30, 2004) (Filing 37 in 8:03CV152) (applying "de novo" standard of review, but granting summary judgment for LINA because the plaintiff failed to provide "due proof" of disability) (italics in original).

The judge's reasoning is quite persuasive.  In addition, and as might be expected, his decision finds strong support in the Court of Appeals.  <u>See</u>, <u>e.g.</u>, <u>Walke v. Group Long Term Disability Ins.</u>, 256 F.3d 835, 839-40 (8th Cir. 2001) (affirming decision to award long-term disability benefits; applying de novo standard of review and stating that when an insurance policy is the ERISA plan, the abuse-of-discretion standard of review applies only if the policy contains explicit discretion-granting language; holding that a policy claim provision stating that administrator will not pay benefits until he receives "satisfactory proof" of entitlement states the obvious and did not confer discretion).  Moreover, I am not persuaded by the counter arguments asserted by LINA.

-20-

In short, I will adopt Judge Riley's analysis of plan language that is identical to the language in this case.   As a result, I subject LINA's eligibility determination to de novo review.

### 2. The Merits

Wilson bears the burden of establishing his right to receive benefits under ERISA.  See, e.g., Farley v. Benefit Trust Life Ins. Co., 979 F.2d 653, 658 (8th Cir. 1992) (citing 29 U.S.C. § 1132(a)(1)(B) and holding that burden of proof was on insured to establish that treatment was medically necessary under an ERISA health care plan); 29 U.S.C. § 1132(a)(1)(B) (allowing an ERISA plan participant to sue "to recover benefits due to him under the terms of his plan").  More particularly, Wilson was required to provide "due proof" (LINA 0453) that he is "unable to perform all the material duties of any occupation for which he is or may reasonably become qualified based on his education, training or experience."[5]  (LINA 0434.)   Without question, Wilson has done so.

Frankly, it is hard to know where to begin.  How LINA could conclude that a heart attack and stroke victim in his early fifties could work full-time even at seated work, when he was literally half blind, had serious vascular problems, and suffered severe pain that deprived him of normal sleep, is beyond me.  That said, here are four points that highlight why I think Wilson made his case (and then some):

\*      All the doctors agreed that Wilson had severe problems.  While they were reluctant to give specific vocational opinions (deferring instead to specialists in that field), the cumulative medical record, fairly read, establishes that the physicians

---

[5]I understand LINA to concede that Wilson could not return to his former job, and thus was entitled to benefits during the first 24 months.  If I have misunderstood LINA's position, the evidence conclusively and without any question demonstrates such a disability.

-21-

doubted that he could work at any full-time job.  Two examples are illustrative.  Dr. Blakely observed that Wilson was partially blind, and: "This is a significant disability that impairs even activities of daily living."  (LINA 0109.)[6]  Dr. Burkman, a Fellow of the American Academy of Physical Medicine and Rehabilitation and a Fellow of the American Academy of Disability Evaluating Physicians, felt that Wilson's "combination of impairments would make any work situation extremely difficult[] . . . ."  (LINA 0106.)[7]

    *       LINA denied Wilson long-term benefits, concluding that he could work as a communications consultant or dispatcher (LINA 0186) before receiving a vocational assessment.  (LINA 0544.)  And, when LINA finally ordered a vocational assessment, the report it received was, at best, superficial.  (LINA 0183.)

    *       In contrast to the one-page vocational assessment that LINA obtained, Wilson provided LINA with a much more reasoned and complete evaluation.  (LINA 0100-0105.)  That assessment, unlike the one LINA obtained, was based, in part, upon two interviews of Wilson.  It also contained a much more thorough review of the

————————————————

    [6]LINA argues that Wilson could drive and do things around the house like cook.  These are "make-weight" arguments.  Lots of people who genuinely cannot work have the capacity to drive around small towns like Kearney, Nebraska, or heat a cup of soup.  Nothing in the record comes close to establishing that Wilson's activities of daily living could reasonably be equated with the demands of a full-time job.

    [7]LINA places emphasis on Dr. Rodgers's suggestion that Wilson could "[l]ift, carry, push and pull, sedentary – see below."  (LINA 0131.)   However, when the report is read in full, it contains several statements that contradict that cryptic comment.  For example, Dr. Rodgers observed that Wilson's vision problems "would affect his ability to work on a daily basis, no matter what type of work he was in" and, partially because of Wilson's "chronic continuous, ongoing leg pain[,]" Dr. Rodgers "strongly recommend[ed] that [the] patient have a disability rating exam" before a decision was reached.  (LINA 0131.)  Only by taking snippets out of the Rodgers report can one find support for LINA's position.

medical records.  It concluded that Wilson could not perform light or sedentary work. (LINA 0105.)

\*      When deciding Wilson's Social Security application, the SSA, which is not known for handing out disability benefits easily,[8] reviewed much of the same evidence and applied that evidence to a similar standard of eligibility. (LINA 0062-0063 & LINA 0048-0049.)  An Administrative Law Judge determined that Wilson could not perform even sedentary work (LINA 0049) and awarded government benefits.  While this decision was not binding upon LINA, it is persuasive evidence of how a disinterested and objective examiner would view the seriousness of Wilson's condition and his ability to perform light or sedentary work.[9]

### B.  LINA is Entitled to Offset Social Security Benefits

As I read the briefs, Wilson does not dispute that he is obligated to honor, and LINA may enforce, both the reimbursement agreement and the plan provisions giving LINA the right to credits or reimbursements if Wilson received Social Security payments.  In any event, I decide that both the agreement (LINA 0362) Wilson signed and the plan (LINA 0451) under which he is covered clearly so provide.

---

[8]Pursuant to 42 U.S.C. § 405(g), I frequently must review Social Security decisions.  I have more than a passing familiarity with those cases.

[9]LINA does not claim the Social Security decision is irrelevant.  Indeed, it would be hard for LINA to make that assertion with a straight face since LINA's liability to make payments is reduced under the policy by a Social Security award.  In any event, it is my opinion that the Social Security decision, which was provided to LINA during the administrative phase, is relevant, although not conclusive.

## IV.  CONCLUSION

Save for the issue of attorney fees, I presume that this opinion resolves this case.[10]  Therefore, and after the resolution of the fee question, I will enter a judgment providing substantially as follows:

(1)    Judgment is entered for the plaintiff and against the defendant declaring that the plaintiff is entitled to long-term disability benefits from the defendant and the defendant is ordered to provide them in a timely fashion and in accordance with the provisions of the policy.  The court retains jurisdiction to enforce this judgment. Otherwise, the plaintiff's complaint is dismissed with prejudice.

(2)    Judgment is entered for the defendant and against the plaintiff declaring that the defendant may enforce, and the plaintiff is ordered to comply with, the reimbursement agreement and the provisions of the policy regarding credits or reimbursements for Social Security payments. In particular, but without limitation, the defendant may subtract Social Security payments received by the plaintiff from the long-term disability benefits due the plaintiff under the insurance policy.  The court retains jurisdiction to enforce this judgment.  Otherwise, the defendant's counterclaim is dismissed with prejudice.

(3)    The plaintiff is the primary prevailing party, and taxable costs shall be paid by the defendant.

If attorney fees are awarded, the judgment language set forth above will be amended to include that determination.  With that caveat, the lawyers should advise me within 10 days of today's date if they believe the language (as opposed to the substance) of the proposed judgment is erroneous or incomplete.

Accordingly,

---

[10]If I am wrong, and the parties think that some other issue requires resolution, they should promptly advise me.

IT IS ORDERED that:

1.  The plaintiff's motion for summary judgment (filing 22) is granted to the extent that the plaintiff is entitled to long-term disability benefits from the defendant and the defendant must provide them in a timely fashion and in accordance with the provisions of the policy.  Otherwise, the motion is denied.

2.  The defendant's motion for summary judgment (filing 21) is granted to the extent that the defendant may enforce, and the plaintiff must comply with, the reimbursement agreement and the provisions of the policy regarding Social Security payments.  In particular, but without limitation, the defendant may subtract Social Security payments received by the plaintiff from the long-term disability benefits due the plaintiff under the insurance policy.  Otherwise, the motion is denied.

3.  Any application for attorney fees shall be filed no later than 15 days following the entry of this order.  Any response shall be filed within 15 days thereafter. Otherwise, counsel are directed to follow NECivR 54.3 and 54.4.

4.  Judgment shall be withheld until further order.

March 29, 2006.                          BY THE COURT:

                                         s/ *Richard G. Kopf*
                                         United States District Judge

-25-